# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 1:21-cr-464-RCL** |
| v. | : | |
| | : | |
| JON MOTT, | : | |
| | : | |
| Defendant | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Jon Mott to 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

### I.    Introduction

Defendant Jon Mott, a 40-year-old small business owner, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

Defendant Mott pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 30 days' incarceration and 36 months' probation is appropriate in

---

[1] Although the Statement of Offense in this matter, filed on November 30, 2022, (ECF No. 46 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

this case because Mott: (a) entered the Capitol through the Rotunda Doors with a large group of rioters who pushed past the vastly outnumbered police officers who vainly attempted to prevent the rioters' unlawful entry into the building; (b) walked to the Rotunda after he was hit in the eyes with a chemical irritant; (c)  argued aggressively with police officers while he was inside the building; (d) maintains a GiveSendGo campaign in which he claims that he and other January 6 rioters have been mistreated by law enforcement officials; and (e) has failed to express genuine remorse for his criminal conduct on January 6.

In reaching an appropriate sentence for Mott, the Court should  consider that his conduct on January 6, like that of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to disrupt the proceedings and overwhelm police officers trying to prevent a breach of the Capitol Building.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 46 (Statement of Offense), at ¶¶ 1-7.

### Defendant Mott's  Role in the January 6, 2021 Attack on the Capitol

On or about January 4, 2021, Jon Mott and another individual traveled from Arkansas to the District of Columbia with funds obtained, or expected to be obtained, from a GoFundMe account.[2] See ECF 47 ¶ 13.  Both persons traveled to D.C. to protest the election and attend the Stop the Steal rally at the Ellipse, which they attended together before being separated.  After the rally, Mott marched to the Capitol Building and made his way to the East Front of the building. At

_____

[2] The individual who traveled with Mott later claimed their GoFundMe account funds were seized.

approximately 2:56 pm, Mott entered the Capitol as part of a large crowd through the Rotunda doors.

When Mott entered the Capitol, a large riotous crowd was immediately outside the Rotunda doors and a smaller group of rioters had already entered the building through those doors. Image 1, below, shows Mott's 2:56 p.m. entry into the building. Mott is identified with a red circle in Image 1. On January 6, he had a goatee and wore a greenish-gray jacket, blue jeans, and a knit cap. Capitol police officers manning the Rotunda Doors entrance when Mott entered the Capitol Building are identified in Image 1 with yellow arrows.



*Image 1*

Once inside the Capitol, Mott walked into the Rotunda and removed his knit cap. Police officers had previously deployed tear gas and other chemical irritants to disperse the crowd and dissuade rioters seeking entry into the Capitol. Mott had swollen red eyes while in the Rotunda, likely caused by his exposure to tear gas, and poured water on another rioter's face at one point. See Image 2, below.



*Image 2*

Inside the Rotunda, Mott used his cellphone to take video of the chaotic scene. *See* Image 3.  Mott was standing close to a door to the Rotunda that Metropolitan Police Department (MPD) officers were attempting to block rioters from using to enter other parts of the Capitol.



*Image 3*

By approximately 3:00 pm, Mott had joined a group of rioters yelling at the MPD officers blocking the exit that led to other sections of the Capitol. *See* Image 4, from MPD officer's body-worn-camera.

4



*Image 4*

Mott then moved to the front of this group and verbally confronted an MPD police officer. *See* Image 5. When this officer used a baton to limit Mott's advance, Mott grabbed the baton with his right hand and pushed it away. *See* Image 6.



*Image 5*                                    *Image 6*

Mott then yelled at the officer, "don't touch me," and "if you don't touch me, I won't touch you." Mott's body was pressed against the officer's baton. *See* Images 7 and 8.



*Image 7*                                    *Image 8*

5

A person behind Mott then pushed Mott into the officer.  Image 9, below, shows  Mott's greenish-gray jacket pressed against the officer's baton because of others pushing Mott into the officer.



*Image 9*

At approximately 3:02 p.m, Mott got into an argument with another MPD officer.  *See* Image 10. This officer and several others were entering the Rotunda through a nearby doorway just before Mott accosted him.



*Image 10*

Mott then walked to the center of the Rotunda where he shouted in protest.  *See* Image 11.



*Image 11*

By 3:05 p.m. police officers gathered to forcibly push the crowd out of the Rotunda and through the Rotunda door exit.   As the officers advanced on the rioters, Mott moved into the immediate path of the officers, apparently attempted to impede their forward movement.   *See* Image 12, below.



*Image 12*

From this location, Mott again confronted police officers, as shown in the screen shots from officer body-worn-camera videos, Images 13 through 16, below.[3]  I




*Image 13*



*Image 14*

---

[3] Image 13 shows Mott arguing with the MPD officer wearing the body-worn camera.  Image 14 shows Mott arguing with an MPD officer with a bike helmet. Image 15 showing Mott arguing with an MPD officer wearing a riot helmet with shield.  Image 16 shows Mott as he remained defiant approximately 4 minutes into officers' attempts to force the rioters out of the Rotunda.



|                  |                  |
| :--------------: | :--------------: |
| *Image 15*       | *Image 16*       |

Mott's defiance continued once he was pushed into the foyer of the Rotunda doors.  Images 17 and 18, below, screen shots from video taken by a fellow rioter, show Mott again challenging a police officer in the congested foyer area.



|                  |                  |
| :--------------: | :--------------: |
| *Image 17*       | *Image 18*       |

At approximately 3:13 p.m., police officers forcibly pushed Mott out of the Capitol building. ECF 46 ¶ 8.  As Mott approached the exit he smiled proudly (Image 19) and  turned and raised his right fist in the air just before he exited the building (Image 20).  Mott was inside the Capitol for a total of 17 minutes.



*Image 19*



*Image 20*

*Social Media Posts*

A review of Mott's social media accounts did not uncover evidence that he engaged in social-media promotion of his or others' breach of the Capitol on his cellphone.  However, Mott has maintained an active GiveSendGo funding campaign in which he describes his beliefs that he and other January 6 rioters have subject unjust treatment at the hands of law enforcement officials. ECF 47 ¶ 46 & Image 21.



*Image 21*

In this fundraising campaign website, Mott refers to the "injustice that is happening with our fellow Americans surrounding January 6th at our nation's Capital." *See* Image 21. Mott also admits he was inside the Capitol for 17 minutes to protest and asks for funds for "upcoming legal fees." *Id.* To date, Mott's GiveSendGo account has raised $14,060 toward Mott's $30,000 goal. ECF 47 ¶ 46 and Image 21.

*Mott's FBI Interview*

On May 13, 2021, FBI agents arrested Mott pursuant to a warrant based on his January 6, 2021 criminal actions.  After waiving his *Miranda* rights,  Mott provided a statement to agents while being transported from Flippin to Fort Smith, Arkansas.  Mott admitted that before traveling to DC he told his family, "look I'm not telling y'all that this is the right thing to do, but this how I feel at the moment." Mott claimed he went to DC to protest and have his voice heard.     Mott claimed when he entered the Capitol it had already been breached and everyone was all over the

Capitol building.  Mott also claimed he thought the Capitol was breached by "bad people" like Antifa and then he and other "good people" entered because it was open. Mott claims he thought people could go into the Capitol; otherwise police officers near the entry could have grabbed him and said, "you are not coming in here."  Mott also claimed he helped people because they (officers) were "gassing the crap out of us" and he got the "brunt end of the deal" with the pepper spray and gas.  Mott stated that January 6 was a "big day," and a "day in history" and "I ain't going to apologize to nobody because it's my right."

*The Charges and Plea Agreement*

On May 11, 2021, the United States charged Mott by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On May 13, 2021, law enforcement officers arrested him at his home in Arkansas. On July 13, 2021, the United States charged Mott by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On November 30, 2022, pursuant to a plea agreement, Mott pleaded guilty to Count Four of the Information, charging him with a violation of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

## III.   Statutory Penalties

Mott now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Mott faces up to six months of imprisonment and a fine of up to $5,000. Mott must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 30 days' incarceration and 36 months of probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Mott's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Mott, the absence of violent or destructive acts is not a mitigating factor. Had Mott engaged in such conduct, he or she would have faced additional criminal charges.

The most important factors in Mott's case are evaluating his defiance and arguing aggressively with police officers in the midst of the riot. Even if Mott did not place his hands on those officers, he diverted their attention from their primary task of clearing the rioters out of the

Capitol building. And, after this initial officer confrontation, Mott continued to defy officers' commands to exit the building and argued with several officers throughout his 17 minutes inside the building. Those actions prolonged the rioters' occupation of the Capitol building, even if briefly. And Mott did lay his hands on the baton of one officer, albeit in a defensive posture and not in an attempt to wrest the baton from the officer.

Additionally aggravating is Mott's lack of sincere remorse or contrition for his illegal conduct. Mott has no lack of remorse or contrition for his January 6th illegal conduct. First, he downplays his conduct in his post-arrest statement. In that statement, Mott justifies his entry by claiming officers in the doorway could have grabbed him and said, "you are not coming in here." Although, Mott had a right to peacefully protest the certification vote in a non-restricted location, he had no right to do so inside the Capitol building on January 6 as part of a violent mob.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 30 days incarceration and 36 months of probation.

**B. Mott's History and Characteristics**

As set forth in the PSR, Mott's criminal history consists of a misdemeanor conviction for Unlawfully Carrying a Weapon. ECF 47 ¶ 21. Mott pled guilty to this Oklahoma misdemeanor charge and was sentenced to a 180-day suspended sentence. *Id.* On May 13, 2021, agents found two firearms silencers without required markings of identification or seal numbers at Mott's home. ECF 49-1.

Mott has an Associate Degree and is certified to work on trucks and heavy equipment. ECF 47 ¶ 39. Since 2020 has owned and operated The Bearn Barn, a local coffee shop. ECF ¶ 41. Mott has not provided a Net Worth Statement or Monthly Cash Flow Statement nor has he provided a financial release information in preparation for his PSR. See ECF ¶ 46. Prior to

opening his coffee business, Mott claimed to work as a mechanic in the oil and gas industry, where he earned $90,000 to $100,000 annually.  ECF ¶ 43.  Mott also has an active GiveSendGo funding campaign for legal fees given his belief in the injustice surrounding individuals who participated in the January 6th riots. ECF 47 ¶ 46 & Image 21. To date, Mott has currently raised $14,060 toward his $30,000 goal.  *Id.*

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37). There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

In this case, a  sentence of 30 days incarceration and 36 months of probation is warranted to underscore that Mott's conduct is criminal, and to deter him from engaging in future lawless conduct.  As already noted, Mott squared up with police officers on at least three separate occasions while "demonstrating" inside the Capitol.  Mott also has an active GiveSendGo funding campaign that details his belief in injustice surrounding individuals who participated in the January 6th riots and as of February 1, 2023 raised $14,060 toward his $30,000 goal.  ECF 47 ¶ 46.  In this case, Mott's continued campaigning for funds based on his and other rioters' January 6th conduct, shows a lack of remorse and demonstrates a very real need for specific deterrence in the form of some incarceration time and a fine equal to the amount of funds raised in his GiveSendGo account.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Mott based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Mott has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With

17

regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out,

you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); United States v. Peterson, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, *United States v. Pamela Hemphill*, 21cr555 (RCL) is a suitable comparator. There the defendant, like Mott, pleaded guilty to a single count of violation 18 U.S.C. § 5104(e)(2)(D). Like Mott, she deliberately pushed through police lines protecting the East front

of the Capitol. When stopped by law enforcement officers, she used her age and infirmity as an excuse and distracted officers from their duty protecting Congress and the Capitol, while they attended to her instead. She also encouraged other rioters to overrun the police line and enter the Capitol Building. Like Mott, she entered and remained in the Rotunda of the Capitol Building, despite clear signs of violent entry. After exiting the Capitol  Building, the defendant remained with a crowd of other rioters just outside the Rotunda doors for more than 30 minutes. This Court sentenced Hemphill to 60 days' incarceration, 36 months' probation, and $500 restitution.

Another comparable case is *United States v. John Lammons*, 22cr103 (RCL). Before entering the Capitol Building, Lammons saw chaos that should have deterred him from entering, including police using a concussion grenade and pepper spray in response to rioters' attacks. He nevertheless entered the Capitol through the Senate Wing Door at 2:16 p.m., less than five minutes after it was violently breached by rioters. He later described this group of rioters as "totally professional." While inside the Crypt, Lammons appeared to smoke marijuana. He ran into a group of rioters that were rushing a police line and told those rioters to "hold your ground." Like Mott, Lammons struck a victory pose as he walked towards the exit of the Capitol. This Court sentenced Lammons to 30 days' incarceration, 36 months' probation, and $500 restitution.

A third comparable case is *United  States v. Jordan Revlett,* 21-cr-281 (JEB). Revlett, like Mott, entered the Capitol alone, and was in the Rotunda during confrontations between police officers and rioters.  Unlike Mott, Revlett entered through another, the Upper West Terrace, doorway, Revlett was in the Capitol for approximately 30 minutes, and Revlett broadcast his breach of the Capitol and related videos from inside the Capitol while inside. Unlike Mott, Revlett did not confront or argue with officers.  Both Revlett and Mott, were forced out of Capitol by MPD officers via the Rotunda doors, both attempted to minimize their conduct when interviewed by

FBI, and both failed to show meaningful remorse for their January 6 conduct.   On July 7, 2022,

Judge Boasberg sentenced Revlett to 14 days of incarceration followed by 12 months of probation

sentence, 60 days community service, and $500 restitution.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is

"only one of several factors that must be weighted and balanced," and the degree of weight is

"firmly committed to the discretion of the sentencing judge." United States v. Coppola, 671 F.3d

220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the

result that "different district courts may have distinct sentencing philosophies and may emphasize

and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its

own set of facts and circumstances regarding the offense and the offender." *United States v.*

*Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence

differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have

sentenced that defendant." *Id*. at 1095.[5]

---

[5] Numerous judges of this Court have concluded that a sentencing court in a case involving a
violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a
period of incarceration followed by a period of probation – for defendants convicted of federal
petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL),
2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible
under law and warranted by the circumstances of this case); see generally Appellee's Brief for the
United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately
nine judges of this district have authorized and imposed such split sentences pursuant to law. *But
see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023)
(holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(1), which
authorize limited periods of intermittent confinement as a condition of probation. The courts have
consistently found that such a sentence is permissible for up to two weeks' imprisonment served
in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2
(D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term
to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation,"

## V.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     Graciela Rodriguez Lindberg
Assistant U.S. Attorney
Southern District of Texas- Detailee
Texas Bar No. 00797963
11204 McPherson Road, Suite 100A
Laredo, Texas  78045
956-723-6523 (office)
graciela.lindberg@usdoj.gov

---

described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

<u>**CERTIFICATE OF SERVICE**</u>

On this 1st day of March 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

<u> /s/ *Graciela R. Lindberg*</u>
Graciela R. Lindberg
Assistant U.S. Attorney